# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2581 | **DATE** | 3/27/2002 |
| **CASE TITLE** | MICHELLE M. WAUGAMAN vs. UNIVERSITY OF CHICAGO HOSPITALS | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion to strike the affidavits of Marilyn Rice and Shawn O'Connell [20] is granted in part and denied in part, and defendant's motion for summary judgment [11] is granted. This case is terminated. Any pending motions are denied as moot. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 29 |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| CG | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

MAR 28 2002

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHELLE M. WAUGAMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| **v.** | ) | |
| | ) | **00 C 2581** |
| **UNIVERSITY OF CHICAGO HOSPITALS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michelle Waugaman ("Waugaman") has sued her former employer for alleged violation of the Pregnancy Discrimination Act ("PDA") amendments to Title VII of the Civil Rights Act of 1964 ("Title VII"). 42 U.S.C. § 2000e(k). Before the Court is defendant University of Chicago Hospitals' ("hospital") motion for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56. Also before the Court is plaintiff's motion to strike the affidavits of Marilyn Rice and Shawn O'Connell submitted in support of the hospital's motion for summary judgment. Although plaintiff argues in her sur-response in opposition to defendant's motion for summary judgment that a supplemental affidavit of Rice should also be stricken, plaintiff failed to file a motion to that effect and therefore that motion is not properly before the Court and the Court shall not entertain it. For the reasons set forth below, plaintiff's motion to strike is granted in part and denied in part and defendant's motion is granted. This case is hereby terminated.

-1-

## Motion to Strike

Waugaman moves to strike the affidavits of Marilyn Rice ("Rice") and Shawn O'Connell ("O'Connell) in their entirety on the grounds that they contain statements that contradict those made in their earlier depositions. "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). An affidavit contradicting earlier deposition testimony need not be disregarded if "it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Id.* at 531-32; *see also Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999) ("Courts generally ignore attempts to patch-up potentially damaging deposition testimony with a supplemental affidavit unless the party offers a suitable explanation–e.g., confusion, mistake or lapse in memory–for the discrepancy."); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989) ("An inconsistent affidavit may preclude summary judgment, however, if the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony or if the affiant lacked access to material facts and the affidavit sets forth the newly-discovered evidence.") Thus, we must determine whether the affidavits of Rice and O'Connell contradict their prior sworn testimony, and, if so, whether any of the above-mentioned exceptions apply.

The United States Court of Appeals for the Seventh Circuit recently took the opportunity to discuss the types of contradictions contemplated by this line of cases. *See Kalis*, 231 F.3d at 1054-56. The court first pointed to its decision in *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996). The plaintiff in *Buckner* stepped on an object, causing herself to fall and injure herself. *Id.* at 1055. The object causing the fall was never found. *Id.* In her deposition, the plaintiff testified that she did not know what the object was, but described it to be "something uneven and faulty," and later as a "lump" under her foot. *Id.* (quoting *Buckner*, 75 F.3d at 292). However, in a subsequent affidavit produced in opposition to the defendant's motion for summary judgment, the plaintiff stated that the object "felt to be about the size of a ladies watch, which is one of the items that were on the display tables." *Id.* at 1055-56 (quoting *Buckner*, 75 F.3d at 292). In affirming the district court's decision to exclude the affidavit, the court noted that in *Buckner* they stated:

> In the context of opposing a motion for summary judgment, and when contrasted with a clear prior statement disclaiming knowledge of the object, this highly specific description appears to be an effort to undo (contradict) the effects of the deposition testimony and thereby establish the missing causal link between the store and the fall.

*Id.* at 1056.

The court thereafter noted that the case pending before them was analogous. *Id.* The plaintiff, from the beginning, had disclaimed any knowledge of the manufacturer of the fondue fuel that had exploded and injured her, and was unable to think of anything that could refresh her recollection. *Id.* Then, after the close of discovery, she was able to conclusively state the name of the manufacturer after her attorney showed her some pictures. *Id.* The court held that, like

the affidavit in *Buckner*, this plaintiff's affidavit "does not function to clarify prior statements, but it 'appears to be an effort to undo (contradict) the effects of the deposition testimony.'" *Id.* (quoting *Buckner*, 75 F.3d at 293).

With this established, upon close examination of the deposition testimony and the affidavits, the Court finds that many of the statements contested by the plaintiff do not contradict earlier deposition testimony in the manner prohibited by this line of cases. In certain instances the questions asked of deponents were so vague that the Court cannot find the statements in the affidavit contradictory. In other instances, the statement in question merely serves to clarify previous testimony. Further, in some cases, the affiant has provided a reason for the testimony, whether it's a lapse in memory, confusion, or mistake. For this reason, the Court will not strike the affidavits in their entirety, but will address the Court's reasoning for including or excluding any individual fact to which plaintiff has objected if and when that fact becomes pertinent to the Court's analysis. To the extent that the affidavits clearly contradict Rice and O'Connell's deposition testimony and they have not provided a suitable reason for the contradiction, the motion is granted. The Court, therefore, grants in part and denies in part Waugaman's motion to strike.

## Facts

Waugaman was formerly employed by the hospital, working as a Patient Care Technician ("PCT") in its Critical Care Center. (Def.'s LR 56.1(a)(3) ¶ 1.) She began her work there in

September 1995 after completing an intensive nine-week training program. (*Id.* ¶ 2.) She, like all of the other PCTs in the Critical Care Center, worked at the direction of registered nurses and was responsible for various aspects of patient care. (*Id.* ¶ 3.) As a PCT, her duties included the types of duties traditionally performed by Nurse's Aides such as giving bed baths or changing bed pans, helping patients to ambulate, get out of bed or reposition themselves, turning patients in their beds, transferring patients between beds and gurneys or wheelchairs, and supporting the weight of a patient or his or her limb when dressings were being changed. (*Id.*)[1] Moreover, PCTs were trained to provide phlebotomy and respiratory therapy treatment and trained to perform EKGs. (*Id.*)[2]

Waugaman thereafter became pregnant and informed her supervisors in May 1996. (*Id.* ¶ 7.) Then, on or about June 6, 1996, she provided them with a note from her obstetrician, Dr. Michele Helfgott ("Helfgott"), which stated that she must not engage in "any heavy lifting more than 10-15 lbs." and that she could not enter rooms where radiation therapy was being administered. (*Id.* at ¶ 8.) At the time, the hospital did not maintain a light duty or restricted duty program, and she was told that she could not work in the Critical Care Center with

---

[1] The Court has not stricken this statement of fact as the subject of PCT's duties never came up during O'Connell's deposition. Thus, her affidavit does not contradict her prior deposition.

[2] Again, the Court has not stricken this statement as it does not conflict with O'Connell's deposition testimony. In fact, O'Connell's deposition testimony falls in line with her subsequent affidavit as she stated that the idea behind creating the PCT position was to consolidate a number of positions such as that of an EKG technician, a lab technician, and a respiratory technician all into one so that patient care would be more patient-centered and there would be less people going into and out of patients' rooms. (*See* Pl.'s Mot. Strike, O'Connell Dep. at 24-25.) Thus, the statement in her affidavit merely complements or supplements her earlier testimony.

restrictions. (*Id.* ¶¶ 6, 9.) Although Waugaman assured her supervisors that the doctor's restriction did not mean that she was experiencing any complications, they told her that they could not allow her to continue working unless the doctor's note was revised. (*Id.* ¶¶ 8-9.)[3] However, O'Connell told her she could continue working until her next doctor's appointment, at which point she would have to take leave if her restrictions were not removed. (*Id.* ¶ 9.)[4]

Waugaman continued to work at the hospital until approximately the end of July 1996, at which point she took a bereavement leave due to the death of her stepfather. (*Id.* ¶ 10.) Although bereavement leaves are typically three days long, plaintiff extended her leave until approximately mid-August. (*Id.*) However, when she visited Helfgott on August 14, Helfgott told her that she should stay completely off work. (*Id.* ¶ 11.) She thereafter released Waugaman to work on the same restrictions as before the leave on August 23, 1996. (Def.'s Ex. C, Helfgott Release at Tab 7.)

Around that time, Marilyn Rice, a recruiting specialist in the hospital's human resources department, worked with Carol Hook, the Hospital's FMLA coordinator, and reviewed the

---

[3]After Waugaman informed the hospital of the restrictions imposed by her obstetrician, O'Connell, the Director of Clinical Care told her, "look, you either work against your restrictions, get your doctor's note changed, or you're fired." (Pl.'s LR 56.1(b)(3)(B) ¶ 1.)

[4]The Court has not stricken this statement in O'Connell's affidavit as it is consistent with her deposition testimony. O'Connell's deposition testimony was that she told Waugaman that she could continue working but that they needed further clarification from her physician as to which of her job duties she could and could not do because it would be hard for them to accommodate the restrictions and they were worried about her getting injured on the job. (*See* O'Connell's Dep. at 44-45.)

requisitions for PCT positions that were open and available at the time. (*Id.* at ¶ 18;[5] *see also id.* ¶ 17.[6]) She contacted the directors in two departments where positions were available, explained Waugaman's restrictions to them, and inquired into whether she would be a suitable candidate. (*Id.*) Both directors told her that the positions could not accommodate Waugaman's lifting restrictions. (*Id.*)

Then, on or about September 6, 1996, Waugaman submitted an application requesting a leave of absence under the Family Medical Leave Act ("FMLA") commencing on September 7, 1996 with a return date sometime in February 1997. (*Id.* ¶ 14.) In the application, Helfgott certified that Waugaman was unable to perform work of any kind. (*Id.*) The hospital granted Waugaman's application and placed her on FMLA, receiving short-term disability benefits. (*Id.* ¶ 15.)

Waugaman had her baby on November 13, 1996. (*Id.* ¶ 19.) Then, on or about December 30, 1996, she contacted her supervisor stating that she was ready to return to work. (*Id.* ¶ 20.)

In a letter dated January 16, 1997, Carol Hook notified Waugaman of the hospital's position that because she was unable to return to work upon completion of her FMLA leave, the

---

[5]The Court has not stricken the facts stated in paragraph 18. These statements from Rice's affidavit do not conflict with her deposition testimony. (*See* Rice Dep. at 27-28.)

[6]The Court finds that plaintiff's wholesale denial of Def.'s LR 56.1(a)(3) ¶ 17 is unsupported by her citations to the record. In addition, the Court denies plaintiff's motion to strike the statements in Marilyn Rice's affidavit which support Def.'s LR 56.1(a)(3) ¶ 17 because such statements do not contradict Rice's previous testimony. Rice testified that she recalled that at least two departments with PCT positions stated they could not accommodate her lifting restrictions.

Critical Care Center filled the PCT position she previously held. (Def.'s Ex. 17., Letter of 1/16/97.) In that letter, Hook also notified Waugaman that it was the hospital's position that if an employee had applied for Long Term Disability benefits under the hospital's benefit program, the employee had to provide a medical release statement from his or her physician in order to be considered for open jobs. (Def.'s LR 56.1(a)(3) ¶ 21.) On February 5, 1997, Waugaman submitted a medical release to return to work. (*Id.* ¶ 22.)

Waugaman was at some point contacted regarding an available PCT position at Wylers Children's Hospital, which is a part of the hospital. (*Id.* ¶ 24.) Plaintiff obtained an interview for the position with Rice's assistance and was offered the job in April. (*Id.* ¶¶ 25-26.) Rice placed her in the first new opening for a PCT position of which Rice was aware after being notified of Waugaman's release to return to work. (Def.'s LR 56.1(a)(3) ¶ 24.)[7]

Plaintiff initially accepted the position, but requested that the start date be delayed by one or two weeks. (*Id.* ¶ 27.) This request was granted. (*Id.*) However, plaintiff rescinded her

---

[7]     Although Waugaman has moved to strike the portion of Rice's affidavit that supports this factual assertion, the Court denies the motion because Rice, in her supplemental affidavit, has provided a suitable explanation for the discrepancy, *i.e.*, a lapse in memory that was refreshed with a review of the Employee Requisition form which specifically related to the position that was offered to Waugaman in April 1997. *See Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999) ("Courts generally ignore attempts to patch-up potentially damaging deposition testimony with a supplemental affidavit unless the party offers a suitable explanation–e.g., confusion, mistake or lapse in memory–for the discrepancy.").
    In addition, Waugaman's citation to Ex. 18 (which either refers to defendant's exhibit 18 or her own Ex. 18) in support of her denial of Def.'s LR 56.1(a)(3) ¶ 24 does nothing to support her denial. Accordingly her unsupported denial is insufficient to create a dispute as to the facts offered in Def.'s LR 56.1(a)(3) ¶ 24.

acceptance prior to the start date, informing the hospital that she had accepted another job outside of the hospital. (*Id.* ¶ 28.)

## Discussion

Under Rule 56(c), summary judgment is proper once the moving party has established that no genuine issue of material fact requiring resolution at trial can be found in the record and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing motions for summary judgment, courts must view the evidence in the light most favorable to the non-moving party, meaning that any doubt as to the existence of genuine issues of material fact will be resolved against the moving party. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987); *Sandler Assocs., L.P. v. Bellsouth Corp.*, 818 F. Supp. 695, 702 (D. Del. 1993). However, a party may not rest upon pleadings to oppose a motion for summary judgment and must set forth specific facts showing that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "'[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].'" *Swanigan v. Horsehead Res. Dev. Co., Inc.*, No. 98 C 4738, 1999 WL 755533, at *1 (N.D. Ill. Sept. 7, 1999) (quoting *Liberty Lobby*, 477 U.S. at 252)).

The PDA requires that: "[w]omen affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not

so affected but similar in their ability or inability to work . . . ." 42 U.S.C. § 2000e(k). "While the PDA does not impose an affirmative duty on employers to offer maternity leave or to take other measures to assist pregnant employees, it does require that an employer treat a pregnant employee as well as it would have if she were not pregnant." *Caples v. Media One Express of Ill.*, No. 00 C 3736, 2001 WL 1188882, at *2 (N.D. Ill. Oct. 3, 2001). A plaintiff suing under the PDA can create a triable issue of intentional discrimination by direct or circumstantial evidence. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Waugaman argues that there is both direct and circumstantial evidence that she was discriminated against based on her pregnancy. With regard to her circumstantial evidence of discrimination, Waugaman has opted to utilize the *McDonnell Douglas* methodology. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at 10.)

### 1. Direct Evidence

A plaintiff opposing a motion for summary judgment may produce direct evidence "that which 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1011 (7th Cir. 1997) (quoting *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989)). Direct evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle*, 876 F.2d at 569.

Waugaman contends that the hospital management's conduct and statements to her after she informed them that she was pregnant and subject to restrictions constitute direct evidence of its discriminatory animus. There are four types of statements: (1) Shawn O'Connell, Director of Clinical Care, allegedly repeatedly stated, "look, you either work against your restrictions, get your doctor's note changed, or you're fired"; (2) O'Connell stated "[you can't] refuse to do anything"; (3) Supervisor Anne O'Connor stated, "no one can help you on your job"; (4) and O'Connell stated, "[don't] throw it up in other people's faces that you are pregnant." (Pl.'s LR 56.1(b)(3)(B) ¶¶ 1-3.)

None of these statements are direct evidence of discrimination. The first three statements, and derivatives thereof, merely show that O'Connell abruptly told Waugaman she was not qualified to be a PCT in the Critical Care Center because she was restricted by her physician from lifting more than ten to fifteen pounds. These statements do not lead the Court to conclude, without inference, that Waugaman was discriminated against based on her pregnancy. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (stating that supervisor's calling plaintiff during her recovery from miscarriage and saying "get out of your G_d d__n bed and call your accounts if you want to keep your f____g job" was not direct evidence of discrimination because such statement did not show treatment based on pregnancy).

The fourth admonition is an extremely ambiguous statement and accordingly does not constitute direct evidence of pregnancy discrimination because it would require the Court to make inferences to determine discriminatory intent. Such a statement (and variations thereof) would require not just mere inferences to establish a discriminatory animus, but unreasonable

and speculative ones. Based on the facts of this case, O'Connell's statement that Waugaman should not throw it in co-workers' faces that she was pregnant is not direct evidence of a discriminatory animus of management with regard to any of the alleged adverse employment actions in this case.

In addition, Waugaman claims that the Supervisor Mary Jo Meyers told Waugaman she would help her find another position outside of the Critical Care Center and Meyers stated that she did not personally attempt to find an alternate placement for her. (Pl.'s LR 56.1(b)(3)(B) ¶ 4.) Meyers further testified that she believed Shawn O'Connell was working with the human resources department to find Waugaman a position. Contrary to plaintiff's argument otherwise, Meyers' alleged statement and admitted conduct, without more, simply do not rise to the level of direct evidence of discrimination based on pregnancy. Accordingly, for all of the reasons provided above, the Court finds that Waugaman has failed to present direct evidence of discrimination.

### 2. Circumstantial Evidence

As stated above, although there are other ways to present circumstantial evidence, Waugaman has forgone the other routes and has chosen to use the *McDonnell Douglas* burden-shifting method. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). Under *McDonnell Douglas*, a plaintiff must initially establish a *prima facie* case. *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). To establish her *prima facie* case, she must show that: (1) she was a member of

the protected class, (2) she was performing to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) others, similarly situated but not of the protected class, were treated more favorably. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994); *see Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1141 (7th Cir. 1997). If the plaintiff sufficiently states a *prima facie* case, the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for its action. *Hughes*, 20 F.3d at 746. Once the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the reason provided by the employer was a pretext for discrimination. *Id.* However, "[i]f the plaintiff fails to establish this *prima facie* case, the employer is entitled to summary judgment without the court's even reaching the two other steps of the <u>McDonnell Douglas</u> analysis--the employer's articulating a legitimate, nondiscriminatory reason for its action and the plaintiff's burden to demonstrate that the purported legitimate reason was instead pretext for unlawful discrimination." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001).

The first element of the *prima facie* case is satisfied. It is undisputed that Waugaman was a member of the protected class because she was pregnant or had recently been pregnant during the conduct in question. However, the hospital argues that Waugaman has failed to establish the second, third, and fourth elements of the *prima facie* case.

Waugaman claims to have suffered three adverse employment actions when the Hospital allegedly: (1) forced her to go on leave and stay on leave because the Hospital refused to accommodate her physician-imposed restrictions inside or outside of the Critical Care Center;

-13-

(2) did not try to place her in another PCT position after her pregnancy; and (3) terminated her in November 1996. The Court addresses each of these in turn.

We focus on the alleged termination first. In this case, Waugaman argues she was terminated in November 1996 after the expiration of her FMLA leave. However, the hospital argues that Waugaman was never terminated and that she resigned in April 1997 when she declined the hospital's offer to place her as a PCT in a pediatric oncology unit so she could take another job with a different employer.

Waugaman testified that in late February or early March 1997, she called Marilyn Rice, a recruiter in the human resources department, who told her that Waugaman had been terminated in November 1996. (Pl.'s LR 56.1(b)(3)(B) ¶ 15.) Apparently, Waugaman seeks to admit Rice's statement as a party admission under FED. R. EVID. 801(d)(2). Thus, it is her burden to establish a foundation for the statement's admissibility. *U.S. E.E.O.C. v. Learonal, Inc.*, No. 93 C 2950, 1994 WL 530711, at *3 (N.D. Ill. Sept. 29, 1994) (stating burden of establishing foundation under Fed. R. Evid. 801(d)(2)(D) is on party offering statement).

The Court sees only two potential ways for Rice's statement to be a party admission and, therefore, not hearsay. First, plaintiff may be offering this statement against a party and it is the party's own statement. FED. R. EVID. 801(d)(2)(A). However, Rice is not a party.

Second, plaintiff may be offering this statement against a party and it is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. FED. R. EVID. 801(d)(2)(D). Rice clearly made the statement during the existence of her employment relationship with the hospital. However, the

question is whether Rice's statement concerned a matter within the scope of employment. For purposes of FED. R. EVID. 801(d)(2)(D), "not everything that relates to one's job falls within the scope of one's agency or employment." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir. 1998). "Statements fall within the scope of employment only if there is evidence to suggest that the declarant's employment compelled the statement." *McCammond v. Oxford Bank & Trust*, Nos. 95 C 2213, 96 C 1970, 1998 WL 708796, at *4 (N.D. Ill. Sept. 30, 1998). "For example, a manager responsible for hiring/firing could bind the company if her statements pertain to those issues, while employees with unrelated duties could not." *Id.*

In this case, Waugaman represents that in late February or early March 1997, Rice was the first and only hospital employee to ever tell her she was terminated. However, the record shows that Rice is a recruiting specialist, not Waugaman's supervisor or anyone having power to terminate Waugaman. The record is devoid of evidence that Rice was responsible for terminating any employee, let alone Waugaman. Further, Waugaman has failed to point to anything in the record to support the proposition that notifying employees of their termination was within the scope of Rice's employment. In fact the record shows that Rice's duties were to "recruit candidates for open positions, review applications and resumes and work with the administrative units to set up interviews, extend job offers and complete the hiring process." (Def.'s Ex. D, ¶ 1.)[8] Thus, the Court holds that Rice's statement did not concern a matter within the scope of employment. Accordingly, the Court finds Rice's statement excluded as hearsay.

---

[8]Waugaman fails to argue, and the Court does not find, that this statement in Rice's affidavit is contradicted by any of her deposition testimony.

Further, Waugaman points to no evidence in the record to support that the Hospital deemed her terminated as of November 1996 or at any time. According to Waugaman, she never received from the Hospital any letter stating she was terminated or any notice stating that her benefits had ceased. (Pl.'s Dep. at 195-96.) Waugaman testified that "I had health and benefits – I know I had them in January and February [of 1997]." (*Id.* at 196.) She stated that at some time she talked to somebody at her health insurance company who stated that her benefits were terminated, but she does not know when that conversation took place. (*Id.* at 197.) It is undisputed that an e-mail dated December 18, 1996, from Valerie Villarreal, a hospital benefits employee, to David Haines states that "since STD [short term disability] benefits have exhausted on November 30, 1996, you may want to place her on a leave of absence status effective December 1, 1996." (Pl.'s LR 56.1(b)(3)(B) ¶¶ 20 (citing Pl.'s Ex. 10, 12/18/96 Villareal E-mail); *see* Pl.'s Ex. 12, Waugaman's 11/26/96 Leave of Absence Application.) Waugaman also points to another e-mail dated January 31, 1997 which states that: (1) the hospital did not consider Waugaman as terminated but considered her on "LOA" or leave of absence; (2) the hospital was waiting for a certification from Waugaman's physician to return to work; (2) after that the hospital wanted to consider her for placement in another PCT position; and (3) the hospital wanted to see how this played out before taking action to terminate her. (Pl.'s LR 56.1(b)(3)(B) ¶ 22 (citing Pl.'s Ex. 9, 1/31/97 E-mail).)

Moreover, the undisputed statements of fact show that the hospital offered, and Waugaman eventually turned down, a PCT position at Wylers with the same salary, benefits and other terms and conditions of employment as she would have had as a PCT in the Critical Care

Center. (*Compare* Def.'s LR 56.1(a)(3) ¶ 26 *with* Pl.'s LR 56.1(b)(3)(A) ¶ 26.)[9] Waugaman chose instead to accept a job with another employer, the Wellness Center, because it was closer to her home and required no rotating shifts. (Pl.'s LR 56.1(b)(3)(B) ¶ 16; Def.'s LR 56.1(a)(3) ¶ 28.) The Court finds that based on all of these undisputed facts, no rational jury could find in favor of Waugaman with regard to whether she was terminated.[10]

Next, the Court must determine whether Waugaman has established a *prima facie* case with regard to her claim that the hospital forced her to take leave and stay on leave until she was released to return to work because it would not accommodate her physician-ordered restrictions inside or outside of the Critical Care Center. Because a forced medical leave constitutes an adverse employment action, Waugaman has established the third element of the *prima facie* case. *See Sanders v. City of Chicago*, No. 98 C 5838, 2001 WL 292749, at *5 n.3 (N.D. Ill. Mar. 22, 2001).

However, the Court finds that Waugaman has failed to establish a *prima facie* case of discrimination because she has not pointed to any similarly situated employees not in the

---

[9]To the extent that Waugaman may be attempting to rely on the fact that the position she was offered at Wylers Childrens Hospital had a different work schedule than her position in the Critical Care Center as evidence of an adverse employment action, the Court finds such argument without merit. An adverse employment action is "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). A mere change in schedule, without more, does not rise to the level of a materially adverse employment action. *Caples v. Media One Express of Ill., Inc.*, No. 00 CV 3736, 2001 WL 1188882, at *4 (N.D. Ill. Oct. 3, 2001)

[10]Even if Waugaman could have created a triable issue of whether she was terminated, she has not attempted to point to any similarly situated nonpregnant person who was not terminated. Therefore, she would still fail to make out a *prima facie* case of discrimination based on her alleged termination.

protected class who were treated more favorably. The Pregnancy Discrimination Act does not "require employers to offer maternity leave or take other steps to make it easier for pregnant women to work." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994). Employers are free to treat pregnant women as badly as they treat similarly affected but nonpregnant employees." *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1011 (7th Cir. 1997). To establish that an employer discriminated because of an employee's pregnancy, the employee must show that "she was treated less favorably than a nonpregnant employee under identical circumstances." *Id.* at 1010; *see Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997).

As an initial matter, it is undisputed that on or about June 6, 1996, Waugaman provided her supervisors with a note from her obstetrician, Dr. Michele Helfgott, which stated that Waugaman was not to engage in "any heavy lifting more than 10-15 lbs" and not to enter rooms where chemo or radiation therapy was being administered. (Def.'s LR 56.1(a)(3) ¶ 8.) Plaintiff states that these restrictions were still in effect in late August. (Pl.'s LR 56.1(b)(3)(A) ¶ 11.) Further, it is undisputed that upon consultation with Waugaman, on or about September 6, 1996, Helfgott certified that Waugaman was unable "to perform work of any kind" on Waugaman's Family Medical Leave Act application. (Def.'s LR 56.1(a)(3) ¶ 14.) It is also undisputed that on or about September 20, 1996, Waugaman stated on her application for Long Term Disability benefits under the hospital's benefit program that she had been unable to do any work since August 7, 1996. (*Id.* ¶ 16.) More importantly, it is undisputed that the hospital's position was that when there has been an application for benefits the hospital required a medical release from

the employee's physician in order for the employee to be considered for return to work. (*Id.* ¶ 21.)[11] It is undisputed that Waugaman provided that medical release on February 5, 1997. (*Id.* ¶ 22.) In sum, the undisputed facts in the record establish that the physician-imposed restrictions lasted between June 6, 1996 and February 5, 1997. (*See* Def.'s LR 56.1(a)(3) ¶¶ 8, 14, 16, 21; *id.*, Ex. 17, Letter of 1/16/97; Pl.'s LR 56.1(b)(3)(A) ¶ 11; *id.*, Ex. 6, Helfgott Letter of 11/8/96.) Therefore, the alleged adverse employment action of refusing to accommodate her physician-imposed restrictions either inside or outside of the Critical Care Center began at the very earliest on June 6, 1996 and ended on February 5, 1997.

In support of her argument that other nonpregnant employees were treated more favorably, Waugaman states that co-workers generally assisted other employees when necessary. (Pl.'s LR 56.1(b)(3)(B) ¶ 7.) For example, Waugaman states that when someone had a back problem, fellow workers would assist them. (*Id.*) Waugaman also recalls that when a nurse had a back problem, she was encouraged by her co-workers to perform the lightest part of a patient transfer. (*Id.*) Finally, Waugaman avers that when a clinical specialist named Tina, who was pregnant, entered the room, fellow employees would say, "be careful, be careful." (*Id.*) Unfortunately for Waugaman, she has not attempted to establish that any of these employees had similar physician-imposed restrictions which included a prohibition of lifting anything heavier than ten to fifteen pounds or that the duration of their restrictions was comparable to the duration of her limitation. Therefore, the Court cannot find that these employees are similarly situated.

---

[11]Waugaman does not argue that the requirement of a medical release was due to discrimination based on pregnancy and has not provided any similarly situated nonpregnant employee who was not required to provide a medical release.

Whether Waugaman was able to tell others that she was pregnant is irrelevant to this conclusion. Moreover, the fact that another pregnant employee allegedly received better treatment than she received actually cuts against her argument that the hospital discriminated against employees based on pregnancy.

In addition, Waugaman points to two individuals that she believes were similarly situated, not in the protected class, and treated more favorably. (Pl.'s LR 56.1(b)(3)(A) ¶ 6; *see* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at 10-11.)[12] L. Galich suffered a broken foot, M. Jones experienced back pain, and both received an accommodation.

The hospital permitted L. Galich, a registered nurse, to perform quality assurance reviews of medical charts as an accommodation of her broken foot. Galich required approximately a one-month accommodation. In contrast, the duration of Waugaman's lifting restrictions would have required at least a three- to four-month accommodation, starting from the time she said she was forced to take leave and ending with the date of birth (assuming Waugaman would have had her restrictions lifted immediately after the birth). Because there is a significant difference between having to accommodate a person's restrictions for one month versus having to do so for

---

[12]To the extent that Waugaman bases her *prima facie* case on other employees not mentioned in her response brief, for example, others listed in Pl.'s Ex. 15, the Court finds those employees, who merely asked for a decrease in hours or a shift change, are not similarly situated because there is no evidence in the record that such employees had any lifting restrictions or were incapable of fulfilling all of their job duties. To the extent that Waugaman relies on S. Yates or a PCT named Vernea to establish this element of her *prima facie* case, the record is devoid of any evidence that Yates or Vernea had any physician-imposed restriction or that they sought a position that could accommodate a lifting restriction of ten to fifteen pounds, and thus neither Yates nor Vernea is similarly situated.

over four months, the Court finds that Waugaman has not established that Galich is a similarly situated employee.

M. Jones, a patient service assistant, experienced back pain and had a lifting restriction of twenty pounds. The hospital permitted her to work with that lifting restriction, and Jones did so for 2½ hours and then went back on benefits status. There are two reasons why the Court finds that Waugaman has failed to establish that Jones was similarly situated. First, there is the obvious difference between the duration of the accommodation for Jones versus that required for Waugaman. Second, in contrast to Jones, who was a patient service assistant ("PCA"), Waugaman was a patient care technician ("PCT"). The difference between the two positions is pivotal. According to Shawn O'Connell, a PSA is "basically a housekeeper" with the main responsibilities of housekeeping and stocking supplies. (Pl.'s Ex., O'Connell Dep. at 21.) In contrast, although a PCT's responsibilities involve some checking and ordering of supplies, a PCT's duties also involve "helping patients to ambulate, get out of bed or reposition themselves in bed, turning patients in bed, transferring patients between beds and gurneys or wheelchairs, supporting a patient's weight or limb weight when dressings were being changed, and other similar duties." (Def.'s LR 56.1(a)(3) ¶ 3; *id.*, Ex. B, O'Connell Aff. ¶ 2; *see id.*, Pl.'s Dep. Ex. 4.)[13] According to O'Connell, "[m]any of these [PCT] duties involved moving, lifting, transporting, shifting and turning patients and equipment which weighed in excess of 15 pounds." (Def.'s LR 56.1(a)(3) ¶ 3; *id.*, Ex. B, O'Connell Aff. ¶ 2.) Waugaman has failed to

---

[13]The Court denies Waugaman's motion to strike O'Connell's affidavit statements as to the responsibilities of a PCT and whether those responsibilities required lifting over fifteen pounds because these statements do not conflict with her prior deposition testimony. Further, plaintiff's denial of Def.'s LR 56.1(a)(3) ¶ 3 is unsupported by the parts of the record to which she cites.

fulfill her burden of establishing that a PSA engaged in lifting in excess of ten to fifteen pounds as frequently as a PCT. Because the duties of the PSA and PCT differ significantly and Waugaman provides no basis in her statement of facts to compare the amount or frequency of lifting required by those positions, the Court finds that Jones is not a similarly situated employee.

In sum, because Waugaman fails to point to any similarly situated nonpregnant individual who was treated more favorably, she cannot establish a *prima facie* case of discrimination with regard to being forced to take a leave of absence and stay on leave because the hospital would not accommodate her physician-imposed restrictions inside or outside of the Critical Care Center. Accordingly, the Court need not address whether she has created a triable issue with regard to her performing up to her employer's legitimate expectations.

Next, the Court must address whether Waugaman has established a *prima facie* case with regard to the hospital's alleged failure to find her a position, in the Critical Care Center or elsewhere after February 5, 1997, the date on which she provided her medical release to return to work. Refusing to allow an employee to return to work following a leave of absence is an adverse employment action. *See Swanigan v. Horsehead Resource Dev. Co., Inc.*, No. 98 C 4738, 1999 WL 755533, at *7 (N.D. Ill. Sept. 7, 1999). Further, the hospital has not made an issue of whether Waugaman was able to perform up to the legitimate expectations of the hospital after her work release on February 5, 1997. Thus, Waugaman has established the first three elements of the *prima facie* case with regard to this claim. We must, therefore, determine whether she has established the fourth element, i.e., whether similarly situated individuals were treated more favorably. This, we find, she has failed to do.

In support of her claim that she was discriminated against based on pregnancy after she was cleared to return to work, plaintiff points to three facts. First, she states that the Hospital hired twenty-one PCTs between January 1, 1997 and May 5, 1997. Unfortunately, the exhibit which plaintiff cites in support of this factual statement, Pl.'s Ex. 16, utterly fails to support this proposition. (*See* Pl.'s LR 56.1(b)(3)(B) ¶ 17 (citing Pl.'s LR 56.1(b)(3)(A), Ex. 16).) Accordingly, the Court will not consider the first sentence in Pl.'s LR 56.1(b)(3)(B) ¶ 17 because it is unsupported by the citation to the record as required by LR 56.1, which this Court strictly enforces.

Second, the latter sentence of that paragraph, "At least one, Diane Sawyer, with a hire date of 3/3/97, was assigned to the Critical Care Center" is also unsupported by the cited portion of the record. (*See* Pl.'s LR 56.1(b)(3)(B) ¶ 17; Pl.'s LR 56.1(b)(3)(A), Ex. O'Connell Dep. at 128.) At that page in O'Connell's deposition, which was taken on February 1, 2001, the deponent states that he recognized Diane Sawyer as a PCT employed in the Critical Care Center. He does not state when Sawyer was hired or when she was assigned to the Critical Care Center. Therefore, with regard to the second sentence of Pl.'s LR 56.1(b)(3)(B) ¶ 17, the Court will only consider the fact that O'Connell recognized Diane Sawyer as a PCT in the Critical Care Center.

Third, Waugaman states that there were twelve job postings for PCT positions within the Hospital between December 26, 1996 and March 5, 1997. (Pl.'s LR 56.1(b)(3)(B) ¶ 23.)[14] As discussed above, the relevant time period, however, begins on February 5, 1997, when it is

---

[14]To the extent Waugaman relies on these postings to establish her prima facie case that she was discriminated against based on pregnancy before she was released to work, Plaintiff's Ex. 18 does not establish that any of these positions could have accommodated her lifting restrictions.

undisputed that Waugaman submitted her physician's certification that she was able return to work. During that time period, there were three PCT positions posted. However, the fact that the hospital posted any job openings between February 5, 1997 and March 5, 1997, without any information as to whether and when those positions were filled and by whom, is not sufficient to establish a genuine issue of material fact as to whether any similarly situated individual who was not pregnant or recently pregnant received more favorable treatment.

In sum, Waugaman has failed to establish a *prima facie* case of pregnancy discrimination. Based on the evidence in the record, no rational jury could find that Waugaman was terminated and therefore, she fails to establish an adverse employment action. In addition, the statements of fact before the Court do not establish a dispute as to whether the hospital treated other similarly situated, nonpregnant individuals better than she. Having found that she fails to make out a prima facie case, the Court need not address the hospital's legitimate reasons for her treatment or whether those reasons were a pretext for discrimination. Accordingly, the Court grants the hospital's motion for summary judgment.

### Conclusion

For the above-mentioned reasons, plaintiff's motion to strike the affidavits of Marilyn Rice and Shawn O'Connell [doc. no. 20] is granted in part and denied in part, and defendant's

motion for summary judgment [doc. no. 11] is granted.  This case is hereby terminated.  Any

pending motions are denied as moot.

**SO ORDERED:**                                             **ENTER:**    3/27/02

**HON. RONALD A. GUZMAN**
**United States Judge**